**O**

# United States District Court
# Central District of California

| | |
|---|---|
| ISAAC CASTELLANOS,<br>Plaintiff,<br>v.<br>CITY OF LOS ANGELES et al.,<br>Defendants. | Case № 2:22-cv-01165-ODW (MBKx)<br><br>**ORDER RE POST-TRIAL MOTIONS [222][234][235]** |

## I. INTRODUCTION

Following a six-day trial, a jury found Defendants City of Los Angeles and Los Angeles Police Department Officers Cody MacArthur and Jesse Pineda ("Officer Defendants") liable for civil rights violations against Plaintiff Isaac Castellanos, stemming from Officer Defendants' use of less-lethal munitions after the Los Angeles Dodgers' 2020 World Series victory. The jury awarded Castellanos $11,812,180 in damages, and the Court entered judgment consistent with this award. Defendants now renew their motion for judgment as a matter of law, or in the alternative, move for a new trial or remittitur. Castellanos also moves to amend the judgment, seeking treble damages and pre-judgment interest, and for attorneys' fees and costs. Having deemed the matter appropriate for decision without oral argument pursuant to Federal Rule of Civil Procedure ("Rule") 78, the Court rules as follows.

## II. BACKGROUND

### A. Factual Background[1]

On October 27, 2020, the Los Angeles Dodgers won their seventh World Series championship, and their first since 1988. People throughout Los Angeles gathered in the streets to celebrate.

Sometime between 12:45 a.m. and 1:10 a.m. on October 28, Castellanos and his friends gathered in Downtown Los Angeles, near the intersection of 11th Street and Hope Street ("11th/Hope"). At around 1:03 a.m., Los Angeles Metro Tactical Support Element Number 1 ("TSE 1") arrived mid-block on Hope Street facing south towards 11th Street. Officers MacArthur and Pineda were assigned to TSE 1 and were armed with the 37mm less-lethal munition ("LLM") weapon system.

Shortly after TSE 1 arrived, an unknown person—not Castellanos or his friends—threw a bottle towards TSE 1. The bottle landed roughly twenty-five to thirty feet from Officer Defendants. A TSE 1 officer called "less lethal up," and Officer Defendants advanced towards 11th/Hope.

Castellanos was standing on the southeast corner of 11th/Hope when he noticed TSE 1 and, at that point, started to run away with the crowd. At approximately 140 feet from 11th/Hope, and within a second of each other, Officer Defendants both fired a 37mm LLM round toward the intersection of 11th/Hope. Around the same time, Castellanos turned back to grab a friend and was hit by an object in his right eye, resulting in permanent blindness in that eye.

### B. Procedural History

Castellanos subsequently filed this action against Defendants.[2] (First Am. Compl. ("FAC"), Dkt. No. 35.) Castellanos asserted three causes of action under 42 U.S.C. § 1983 and the California Constitution: (1) violation of his right to free

---

[1] The Court derives this factual background from testimony and video evidence presented at trial.

[2] Castellanos also initially asserted claims against Chief Michel Moore and Lieutenant John Jenal. As the Court dismissed both prior to trial, and neither are subject to the post-trial motions, the Court does not discuss them in the procedural background.

speech and assembly; (2) excessive force; and (3) violation of his substantive due process rights. (*Id.* ¶¶ 74–99.) Castellanos also asserted four causes of action under state law: (1) violation of the Bane Act; (2) assault; (3) battery; and (7) negligence. (*Id.* ¶¶ 100–32.)

On August 17, 2023, Officer Defendants moved for judgment on the pleadings on the § 1983 causes of action based on qualified immunity. (Mot. J. Pleadings ("MJOP"), Dkt. No. 52.) The Court granted the motion in part and dismissed Castellanos's free speech and substantive due process causes of action against Officer Defendants. (Order MJOP 11, Dkt. No. 94.) On August 20, 2024, Defendants moved for summary judgment on all of Castellanos's remaining claims. (Mot. Summ. J. ("MSJ"), Dkt. No. 97.) The Court granted partial summary judgment, leaving Castellanos's excessive force and state law claims intact. (Order MSJ 21, Dkt. No. 126.)

From April 7 to 16, 2026, Castellanos tried his claims to a jury. (*See* Mins. Trial, Dkt. Nos. 194–96, 201–03.) After Castellanos rested, Defendants moved for judgment as a matter of law on the issues of causation and qualified immunity pursuant to Federal Rule of Civil Procedure ("Rule") 50(a). (Trial Tr. 802:24–807:4; 824:6–18.) The Court denied the motion. (Trial Tr. 815:11–12.) Following deliberation, the jury returned verdicts for Castellanos and against Defendants on every one of Castellanos's claims, finding that MacArthur and Pineda were each the cause of Castellanos's injuries. (Verdict 2–5, Dkt. No. 208.) The jury awarded $11,812,180 in damages, consisting of $135,749 for future medical care, $3,676,431 for loss of earning capacity, $1,000,000 for past pain and suffering, and $7,000,000 for future pain and suffering. (*Id.* at 6.) The Court subsequently entered judgment consistent with the jury's awards, including post-judgment interest. (J., Dkt. No. 215.)

Defendants now renew their motion for judgment as a matter of law pursuant to Rule 50(b). (Renewed Mot. JMOL ("Mot. JMOL") 2, Dkt. No. 235.) Alternatively, Defendants seek a new trial or remittitur pursuant to Rule 59. (*Id.*) Castellanos

moves to amend the Court's judgment under Rule 59, seeking treble damages and pre-judgment interest. (Mot. Am. J. ("Mot. Am.") 1–2, Dkt. No. 234.) Castellanos also moves for attorneys' fees as authorized by the Court's judgment. (Mot. Att'ys' Fees ("Mot. Fees") 1, Dkt. No. 222.)

## III. RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW

Defendants renew their motion for judgment as a matter of law pursuant to Rule 50(b). (Mot. JMOL 2.)

### A. Legal Standard—Rule 50(b)

To succeed on a renewed motion for judgment as a matter of law under Rule 50(b), the moving party must: (1) have raised the issues in its pre-verdict Rule 50(a) motion; and (2) demonstrate that there is "no legally sufficient basis for a reasonable jury" to have found in the non-moving party's favor. *Winarto v. Toshiba Am. Elecs. Components, Inc.*, 274 F.3d 1276, 1283 (9th Cir. 2001); *Tortu v. L.V. Metro. Police Dep't*, 556 F.3d 1075, 1081 (9th Cir. 2009) (discussing the procedural requirement for a Rule 50(a) pre-verdict motion). The issues raised in the pre-verdict motion must be specific enough to notify the court and the opposing party of the underlying issue. *Murphy v. City of Long Beach*, 914 F.2d 183, 186 (9th Cir. 1990). Thus, where a party did not raise grounds in a pre-verdict Rule 50(a) motion, a court may not grant judgment as a matter of law on that basis. *EEOC v. Go Daddy Software, Inc.*, 581 F.3d 951, 961 (9th Cir. 2009).

In ruling on a Rule 50(b) motion, judgment as a matter of law is appropriate "if the evidence, construed in the light most favorable to the nonmoving party, permits only one reasonable conclusion, and that conclusion is contrary to the jury's verdict." *Escriba v. Foster Poultry Farms, Inc.*, 743 F.3d 1236, 1242 (9th Cir. 2014); *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 149 (2000) ("[A] court should render judgment as a matter of law when . . . there is no legally sufficient evidentiary basis for a reasonable jury to find for [the prevailing] party on that issue." (citation modified)). However, "[a] jury's verdict must be upheld if it is supported by

substantial evidence that is adequate to support the jury's findings, even if contrary findings are also possible." *Escriba*, 743 F.3d at 1242. "'Substantial evidence' means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Fisher v. City of San Jose*, 558 F.3d 1069, 1074 (9th Cir. 2009).

The standard under Rule 50(b) mirrors that of summary judgment in that, while the court must scrutinize the entire evidentiary record, it may not make credibility determinations or weigh the evidence. *Reeves*, 530 U.S. at 150. The court must "disregard all evidence favorable to the moving party that the jury is not required to believe." *Id.* at 151. Thus, "when two sets of inferences find support in the record, the inferences that support the jury's verdict of course win the day." *Winarto*, 274 F.3d at 1287.

**B. Discussion—Rule 50(b)**

Defendants seek judgment as a matter of law on three issues, the latter two of which are intertwined. First, Defendants ask the Court to revisit its qualified immunity ruling, arguing that the evidence demonstrates Officer Defendants used reasonable force, and that in any event, Officer Defendants did not violate a clearly established constitutional right. (Mot. JMOL 13–15.) Second, Defendants argue that 42 U.S.C. § 1983 requires individualized causation and that alternative liability is not available. (*Id.* at 6–8.) Finally, assuming that alternative liability is unavailable, Defendants argue that the jury's § 1983 verdict is inconsistent and irreconcilable with an individualized causation finding.[3] (*Id.* at 9–10.)

[3] In their Reply brief, Defendants argue for the first time that Castellanos "failed to adduce evidence to satisfy the specific intent and [alternative liability] elements on his state-law claims." (Reply JMOL 4–6, Dkt. No. 245; *see* Mot. JMOL 6–10 (containing no discussion of specific intent or alternative liability).) Although Castellanos does raise alternative liability in his opposition brief, it is in the context of rebutting Defendants' § 1983 and verdict argument, not in the context of any sufficiency of evidence argument related to Castellanos's state law claims. (*See* Opp'n JMOL 10–13, Dkt. No. 242.) Thus, the Court declines to consider Defendants' newly raised arguments regarding sufficiency of causation evidence on Castellanos's state law claims. *See Zamani v. Carnes*, 491 F.3d 990, 997 (9th Cir. 2007) ("The district court need not consider arguments raised for the first time in a reply brief.").

*1. Qualified Immunity*[4]

Defendants ask the Court to revisit its previous rulings and find that qualified immunity insulates Officer Defendants here. (*Id.* at 13–15.) In determining whether a government official is entitled to qualified immunity, courts consider (1) whether there has been a violation of a constitutional right, and (2) whether that right was clearly established at the time of the officer's alleged misconduct. *Pearson v. Callahan*, 555 U.S. 223, 232 (2009). Defendants raise both prongs, arguing that the evidence demonstrates Officer Defendants acted reasonably and did not violate Castellanos's constitutional rights, and in any event, that their conduct did not violate a clearly established right. (Mot. JMOL 13–15.)

(a) <u>Constitutional Violation</u>

First, Defendants argue that the evidence demonstrates Officer Defendants' force was reasonable as a matter of law. (*Id.* at 11–13.) "An excessive force claim is a claim that a law enforcement officer carried out an unreasonable seizure through a use of force that was not justified under the relevant circumstances." *County of Los Angeles v. Mendez*, 581 U.S. 420, 428 (2017). "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham v. Connor*, 490 U.S. 386, 396 (1989).

Courts assess reasonableness using the *Graham* factors, considering (1) "the severity of the crime at issue," (2) "whether the suspect poses an immediate threat to the safety of the officers or others," and (3) "whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight." *Id.* These factors are not exclusive and are considered under "the totality of the circumstances" to determine "whether the severity of force applied was balanced by the need for such force." *Torres v. City of*

---

[4] Although Defendants did not initially raise qualified immunity in their Rule 50(a) arguments, they raised it "before the case [was] submitted to the jury." Fed. R. Civ. P. 50(a)(2); (Trial Tr. 824:6–18.) Thus, the Court overrules Castellanos's objection to the Court's consideration of Defendants' qualified immunity arguments.

*Madera*, 648 F.3d 1119, 1124 (9th Cir. 2011). For purposes of a renewed judgment as a matter of law, where a "jury has found (with reasonable support in the evidence) a constitutional violation by a police officer, courts must view the jury's verdict as sufficient to deny [the police officer] qualified immunity on the first prong of the analysis." *Estate of Aguirre v. County of Riverside*, 131 F.4th 702, 707 (9th Cir. 2025) (citation modified).

Here, the jury found that Officer Defendants violated Castellanos's right to be free from excessive force. (Verdict 2.) This verdict is sufficient to deny Officer Defendants "qualified immunity on the first prong of the analysis" so long as the jury had "reasonable support in the evidence." *Estate of Aguirre*, 131 F.4th at 707. And the jury indeed did have reasonable support in the evidence. Although Castellanos posed no imminent harm to the police officers and was in fact attempting to leave the area, (*see, e.g.*, Trial Tr. 155:7–19), Officer Defendants used significant force that caused Castellanos permanent blindness, (Trial Tr. 714:1–715:1).

The only argument Defendants advance is that the "unruly crowd" rendered Officer Defendants' use-of-force reasonable. (Mot. JMOL 12.) Defendants reach this conclusion by pointing to evidence that "individuals continued throwing bottles, igniting fireworks, and acting unruly." (*Id.*) However, when construed in the light most favorable to Castellanos, the trial record does not support Defendants' characterization of the crowd. As an initial matter, nothing in the record supports Defendants' continued reference to "ignit[ed] fireworks." (*Id.* at 12–13.) Neither Officer Defendant testified that fireworks were a factor in their decision to use force. (*See* Trial Tr. 352:18–445:24.) Additionally, the jury was justified in discounting any threat posed by "throwing bottles." (Mot. JMOL 12.) Although Officer Defendants' body-worn camera footage demonstrates that they faced the danger of thrown bottles, the jury heard sufficient evidence to discount this danger considering the closest bottle landed "at least 25 to 30 feet away from the nearest officer." (Trial Tr. 320:8–12.) Thus, the jury had reasonable support in the evidence to find that Officer Defendants

faced minimal danger from the crowd facing them, rendering their force against the crowd excessive.

(b) Clearly Established Right

Second, Defendants argue that even if Officer Defendants committed a constitutional violation, they are entitled to qualified immunity because the right allegedly violated was not clearly established at the time of the violation. (Mot. JMOL 13–15.) A right is "clearly established" when the law relating to that right "was sufficiently clear that every reasonable official would understand what he is doing is unlawful." *District of Columbia v. Wesby*, 583 U.S. 48, 63 (2018) (citation modified). When examining this second prong of qualified immunity, courts "do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011).

The Court has twice denied qualified immunity in this case after determining that *Nelson v. City of Davis*, 685 F.3d 867 (9th Cir. 2012), put Officer Defendants on notice of a clearly established precedent regarding Castellanos's right to be free from excessive force. (Order MJOP 6–8; Order MSJ 14–15.) The Court's analysis has not changed. Rather, when viewing the evidence in the light most favorable to Castellanos, the similarities between the facts here and the facts in *Nelson* are stark. In *Nelson*, officers fired LLMs at a group between 45 to 150 feet away; here, Officer Defendants fired LLMs at a group 140 to 145 feet away. 685 F.3d at 874; (Trial Tr. 218:4–11.) In *Nelson*, the plaintiff and his friends posed no threat to the officer defendants; here, Castellanos and his friends posed no threat to Officer Defendants. 658 F.3d at 879; (Trial Tr. 155:16–19.) In *Nelson*, the officer defendants' actions left plaintiff blind in one eye; here, Officer Defendants' actions have left Castellanos blind in one eye. 658 F.3d at 879; (Trial Tr. 159:1–10.)

Defendants attempt to distinguish *Nelson* from the facts here by arguing that, in *Nelson*, the officers "deployed pepper balls *directly* at a *specific* group of individuals."

(Mot. JMOL 14.) According to Defendants, the facts here are distinguishable because Officer Defendants "deployed their 37LLMs to disperse the crowd and restore order, not to restrain any individual or group." (*Id.* at 15.) Defendants' attempt to distinguish *Nelson* on this basis is unpersuasive. In *Nelson*, the senior police officer on the scene ordered the use of LLMs to disperse a group of students. 658 F.3d at 874. Similarly here, and as Defendants admit in their moving papers, Officer Defendants deployed their LLM to disperse the crowd at 11th/Hope. (Mot. JMOL 15.) Clearly, the intent in both cases was to disperse a group of people. And to the extent Defendants are attempting to argue that the specific targeting of a "group" in *Nelson* is distinct from the somehow generalized targeting of a "crowd" here, Defendants are arguing a distinction without a difference. From nearly 150 feet away, officers cannot accurately target the pepperball projectiles used in *Nelson* or the 37mm LLMs used here. 658 F.3d at 879; (Trial Tr. 283:16–25.) Thus, when firing "at a distance well beyond that approved under" each respective weapon system's guidelines, accuracy goes out the window. *Nelson*, 658 F.3d at 879. It is of no consequence whether Officer Defendants specifically targeted an individual, a group, or a crowd; what matters is Officer Defendants knew or should have known that, from their distance, their weapon systems were liable to severely and indiscriminately injure. Defendants' attempts to distinguish *Nelson* on these bases fail.

Finally, Defendants attempt to invoke *Puente v. City of Phoenix*, 123 F.4th 1035 (9th Cir. 2024), which the Ninth Circuit decided approximately four years after the events in this case. (Mot. JMOL 13–14.) However, officers "cannot take advantage of subsequent developments in the law to argue that [a] right was not clearly established at the time [they] committed [a] violation." *Sanderlin v. Dwyer*, 116 F.4th 905, 917 (9th Cir. 2024). As the Ninth Circuit decided *Puente* well after the events of this case, the Court must disregard Defendants' *Puente* argument.

In sum, the Court finds that the jury reasonably found that Officer Defendants violated Castellanos's right to be free from excessive force. The Court also finds, as a

matter of law, that *Nelson* clearly established this right at the time of Officer Defendants' misconduct. Thus, the Court finds that Officer Defendants are not entitled to qualified immunity.

*2. Causation under § 1983*

Defendants ask the Court to grant judgment as a matter of law for them on Castellanos's § 1983 excessive force claim, arguing that Castellanos failed to prove that either Officer Defendant was the but-for cause of his injury. (Mot. JMOL 6–8.) "In a § 1983 action, the plaintiff must also demonstrate that the defendant's conduct was the actionable cause of the claimed injury." *Harper v. City of Los Angeles*, 533 F.3d 1010, 1026 (9th Cir. 2008). Similar to a negligence action, to meet § 1983's causation requirement, "the plaintiff must establish both causation-in-fact and proximate causation." *Id.* If the analysis were to stop there, then Defendants would indeed be entitled to judgment as a matter of law because Castellanos did not (and probably could not) demonstrate which Officer Defendant's 37mm LLM round impacted his eye.

However, the analysis does not stop there, because § 1983 "'creates a species of tort liability' that incorporates common-law tort principles." *Peck v. Montoya*, 51 F.4th 877, 891 (9th Cir. 2022) (quoting *Imbler v. Pachtman*, 424 U.S. 409, 417 (1976)). Thus, courts must "turn to the causation factors developed in the common law of torts to supply the necessary causation factor in the civil rights field." *Stevenson v. Koskey*, 877 F.2d 1435, 1438 (9th Cir. 1989). One such factor, as taught in torts classes throughout the country, is the principle of alternative liability, perhaps most famously illustrated in the seminal case *Summers v. Tice*, 33 Cal. 2d 80 (1948) (en banc). The fact pattern is well known: during a quail hunt, two individuals simultaneously, and negligently, fired buckshot at a quail in the plaintiff's direction. *Id.* at 82. One shot struck plaintiff in his eye. *Id.* at 83. Predictably, both defendants argued that only one of them could have been the but-for cause of plaintiff's injuries, and thus, plaintiff must not have proved his negligence claim. *Id.* at 83–84. The

California Supreme Court disagreed, holding that, where two individuals are both "negligent in firing in the direction of a third person . . . both of those so firing are liable for the injury suffered by the third person," even if "the negligence of only one of them could have caused the injury." *Id.* at 84.

As both parties have acknowledged, the Ninth Circuit has not explicitly extended the principle of alternative liability illustrated in *Summers* to § 1983 cases. However, several of her sister circuits have. For example, the Tenth Circuit affirmed a district court's application of alternative liability where multiple prison guards tortiously spread rumors about a prisoner, causing significant risk to a prisoner's safety. *Northington v. Marin*, 102 F.3d 1564, 1567–68 (10th Cir. 1996). Citing the Restatement (Second) of Torts § 433B(3), which discusses alternative liability, the Tenth Circuit concluded that alternative liability "can apply in a § 1983 action when the facts support it" because "[t]ort law principles may appropriately be applied in § 1983 cases." *Id.* at 1568 n.1. The Sixth Circuit, citing *Summers*, held a plaintiff need not "pinpoint *which* specific officer committed *which* specific unconstitutional act" where the plaintiff has presented evidence "from which a jury could find that each defendant engaged in an unconstitutional act." *Pineda v. Hamilton County*, 977 F.3d 483, 493 (6th Cir. 2020) (citing *Fazica v. Jordan*, 926 F.3d 283, 292 (6th Cir. 2019)). The Seventh Circuit, in dicta, noted that *Summers* may apply in a § 1983 case where multiple officer defendants aggressively seized a decedent from a courtroom, causing his death. *Richman v. Sheahan*, 512 F.3d 876, 880, 884–85 (7th Cir. 2008) (Posner, J.).[5]

Considering the above, the Court finds that it may properly apply alternative liability to the instant § 1983 action. For one, while several circuits have applied alternative liability to § 1983 cases, no circuit has rejected the application of

---

[5] Although it ultimately found that the facts did not support an alternative liability instruction, the Second Circuit did not foreclose giving such an instruction in a § 1983 case. *De Michele v. Tierney*, 553 F. App'x 100, 101–02 (2d Cir. 2014).

alternative liability principles to § 1983 cases. Additionally, applying alternative liability principles to § 1983 cases is fully in accord with the Ninth Circuit's instruction to "turn to the causation factors developed in the common law of torts to supply the necessary causation factor in" § 1983 cases. *Stevenson*, 877 F.2d at 1438. Indeed, the Ninth Circuit has not been reluctant to import common law causation principles to § 1983 cases. *See Peck*, 51 F.4th at 891 (applying Restatement (Second) of Torts section 876's imposition of liability to a § 1983 case where a defendant could foresee "his conduct would lead to the commission of a tort"). The Court sees no reason why that instruction would not apply to a fundamental causation principle that has shaped our understanding of causation.

Defendants argue that the Ninth Circuit and other circuits require plaintiffs to prove each defendants' personal participation under § 1983. (Mot. JMOL 6–8; Reply JMOL 1–4.) True. But personal participation and alternative liability are not mutually exclusive principles.

Take the Sixth Circuit's decision in *Pineda*, which Defendants primarily cite in support of their personal participation argument. (Reply 3.) In *Pineda*, three off duty sheriff's deputies were working security at a night club when the plaintiff got into a fight. 977 F.3d at 487. According to plaintiff, one of the three deputies—whom plaintiff could not positively identify—"knocked him unconscious by striking him on the back of the head with his baton." *Id.* Although only one of the deputies swung the baton and knocked plaintiff unconscious, plaintiff sued all three deputies working that night. *Id.* at 487. In affirming the district court's grant of summary judgment for the deputies, the Sixth Circuit held that the plaintiff had failed to "produce evidence supporting each individual defendant's personal involvement in the alleged violation." *Id.* at 491 (quoting *Jutrowski v. Township of Riverdale*, 904 F.3d 280, 291 (3d Cir. 2018)). Critically, the Sixth Circuit noted that *Summers* was inapplicable because, in *Summers*, both hunters negligently discharged their shotguns. *Id.* at 487. However, only one of the deputies in *Pineda* swung the baton, meaning that the other two

defendant deputies "committed no harmful acts and are innocent in a way in which the defendants in *Summers*" were not. *Id*. at 493.

The takeaway from *Pineda*, and every case Defendants cite in support of their personal participation argument, is that each defendant in a § 1983 case must have committed an independently unconstitutional act capable of causing injury to the plaintiff, lest the court impose liability on a defendant officer free from it. Thus, where a plaintiff sues multiple defendants, but only one of them committed an unconstitutional act that led to injury, courts will not extend liability to all the defendants. This principle does not conflict with *Summers* and its progeny, which teach that, where *each* defendant committed an independently unconstitutional act capable of causing injury, courts may impose joint and several liability even if only one of the defendants actually caused the injury.

With these principles in mind, the Court finds that ample evidence supported the jury's verdict finding Officer Defendants jointly and severally liable for their conduct because both could have caused his injury, even if Castellanos did not prove which one of them did. Both Officer Defendants deployed their weapon systems at the time and location that Castellanos was injured. (Pretrial Order, Admitted Facts ¶¶ 5, 8, Dkt. No. 189.) Further, the evidence established that Officer Defendants also directed their weapon systems at 11th/Hope, where Castellanos was located. (Trial Tr. 223:16–224:9.) Castellanos testified that he heard a "loud noise" and saw "some bright lights" immediately before he was "hit in the eye." (Trial Tr. 153:14–18.) Castellanos's friends also heard a "loud bang" immediately before seeing Castellanos "cover his eye." (Trial Tr. 448:18–24.) This evidence, viewed in the light most favorable to Castellanos, certainly supports a finding that either Officer Defendant was the but for cause of Castellanos's injury. As the jury also found Officer Defendants' actions were unconstitutional, the doctrine of alternative liability requires the imposition of joint and several liability against Officer Defendants for Castellanos's injury.

For these reasons, the Court finds that § 1983 permits the use of alternative liability, as explained in *Summers*, to prove causation. Thus, the Court rejects Defendants' argument that Castellanos failed to prove causation simply because he did not identify which Officer Defendant's 37mm LLM round impacted his eye. The Court also finds that substantial evidence supports the jury's causation finding.

*3. Inconsistent Jury Instruction*

Finally, Defendants challenge the verdict, arguing that the jury's finding that both Officer Defendants were more likely than not the cause of Castellanos's injury is irreconcilable with their verdict that both Officer Defendants are responsible for Castellanos's injury. (Mot. JMOL 9–10.) In their verdict form, the jury found that Castellanos proved it is more likely than not that both Officer Defendants used excessive force against him, while apportioning fault 50/50. (Verdict 2, 5.) According to Defendants, the "jury's assignment of liability both to Pineda and MacArthur, where only one Defendant could potentially cause his injury as a matter of law, underscores that Plaintiff failed to establish causation by more than 50% as to either [Officer Defendant]." (Mot. JMOL 10.)

Defendants' argument fails for largely the same reasons as their individualized causation argument fails. As the Court explains above, alternative liability is applicable in § 1983 cases. And in alternative liability cases, the jury is well within its rights to find both defendants responsible even if only one defendant was the actual cause of plaintiff's harm. That is exactly what the jury here found: it found that Castellanos demonstrated that either Officer Defendant could have caused Castellanos's harm. (Verdict 2.) However, because the jury could not determine which Officer Defendant actually caused Castellanos's harm, it allocated responsibility 50/50. (*Id.* at 3.) Considering the Court's alternative liability instruction, and the availability of alternative liability in § 1983 cases, the Court finds this reading fairly harmonizes the jury's "seemingly inconsistent answers." *White v. Ford Motor Co.*, 312 F.3d 998, 1005 (9th Cir. 2002).

For these reasons, the Court rejects Defendants' challenge to the jury's verdict.

**C. Conclusion—Rule 50(b)**

Having considered the entire record and construed reasonable inferences in favor of the verdict and judgment, and without making credibility determinations or weighing the evidence, the Court finds substantial evidence exists to support the jury's findings in the verdict, as discussed above. Further, the Court concludes that Officer Defendants are not entitled to qualified immunity, and that the jury's verdict is consistent internally and with the law. Accordingly, the Court **DENIES** Defendants' renewed Rule 50(b) motion for judgment as a matter of law.

## IV. MOTION FOR NEW TRIAL OR REMITTIUR

Defendants move in the alternative for a new trial or remittitur under Rule 59(a). (Mot. JMOL 15.)

**A. Legal Standard—Rule 59(a)**

Under Rule 59(a), a court may grant a new trial "on all or part of the issues, 'for any reason for which a new trial has heretofore been granted in an action at law in federal court.'" *Id.* (quoting Fed. R. Civ. P. 59(a)). This includes a verdict that is "contrary to the clear weight of the evidence, or is based upon evidence which is false, or to prevent, in the sound discretion of the trial court, a miscarriage of justice." *Silver Sage Partners, Ltd. v. City of Desert Hot Springs*, 251 F.3d 814, 819 (9th Cir. 2001). To establish a miscarriage of justice on the basis of legal error, the error must have substantially prejudiced a party. *Ruvalcaba v. City of Los Angeles*, 64 F.3d 1323, 1328 (9th Cir. 1995); *see also EEOC v. Pape Lift, Inc.*, 115 F.3d 676, 680 (9th Cir. 1997) (stating that a new trial may be granted "only if the verdict is against the great weight of the evidence or it is quite clear that the jury has reached a seriously erroneous result" (citation modified)).

Unlike a Rule 50(b) motion, a motion for a new trial is not limited by a pre-verdict Rule 50(a) motion. *Medisim Ltd. v. BestMed, LLC*, 758 F.3d 1352, 1359 (Fed. Cir. 2014). Additionally, "[t]he district court can weigh the evidence and assess

the credibility of the witnesses," and need not "view the trial evidence in the light most favorable to the verdict." *Experience Hendrix LLC v. Hendrixlicensing.com Ltd*, 762 F.3d 829, 842 (9th Cir. 2014). Still, "a district court may not grant a new trial simply because it would have arrived at a different verdict." *Silver Sage*, 251 F.3d at 819. Indeed, it is the court's duty "to reconcile the jury's special verdict responses on any reasonable theory consistent with the evidence." *Guy v. City of San Diego*, 608 F.3d 582, 586 (9th Cir. 2010) (quoting *Pierce v. S. Pac. Transp. Co.*, 823 F.2d 1366, 1370 (9th Cir. 1987)). Ultimately, "[t]he grant of a new trial is 'confided almost entirely to the exercise of discretion on the part of the trial court.'" *Murphy*, 914 F.2d at 186 (quoting *Allied Chem. Corp. v. Daiflon, Inc.*, 449 U.S. 33, 36 (1980)).

**B. Discussion—Rule 59(a)**

Defendants raise three grounds for a new trial. First, Defendants argue that Castellanos failed to introduce sufficient evidence to support the jury's verdict. (Mot. JMOL 16–18.) Second, Defendants argue that Castellanos's counsel made such inflammatory comments during closing arguments that a new trial is warranted. (*Id.* at 22–23.) Finally, Defendants argue that the jury's damages award was so excessive that the Court should either grant a new trial or remit the award. (*Id.* at 18–21.)

*1. Sufficiency of Evidence*

Defendants first argue that Castellanos failed to proffer sufficient evidence to establish "the requisite causation between a projectile that any officer fired and his injury." (Mot. JMOL 17.) This argument primarily duplicates Defendants' renewed judgment as a matter of law argument: both are predicated on Defendants' mistaken assertion that Castellanos bore the burden of demonstrating which Officer Defendant actually caused his injury.

What does distinguish this argument from Defendants' previous argument are two perceived evidentiary gaps. First, Defendants point to evidence demonstrating that foam baton rounds, like the ones used here, "lose most of their velocity after 30 feet." (*Id.* (citation modified).) The Court can only guess what conclusion

Defendants ask the Court to reach. To the extent Defendants are asking the Court to infer that foam baton rounds fired at 140 feet could not have blinded Castellanos, the Court declines to make such an inference. It is well within reason to assume that a foam baton round, fired at 218 miles per hour and capable of traveling 140 feet in around half-a-second, can cause permanent damage to an eye, even if it starts losing speed almost immediately. (Trial Tr. 290:2–16.)

Second, Defendants point to Castellanos's expert Cole Young's testimony, that he "did not observe through footage any round being expelled from either of the Defendant-Officers' weapons, let alone review the trajectory of any round to link it to [Castellanos's injury]." (Mot. JMOL 17–18.) If Defendants expect the Court to infer that *no round* was expelled, Defendants are mistaken. The video footage clearly demonstrates Officer Defendants fired 37mm LLM rounds at 11th/Hope. The jury did not need an expert to tell them that. And once that fact was established, when paired with evidence that the rounds were expelled at 218 miles per hour, (Trial Tr. 289:21–290:4), the jury had more than a "reasonable basis" to conclude that one of the 37mm LLM rounds impacted Castellanos. *Lam v. City of San Jose*, 869 F.3d 1077, 1084 (9th Cir. 2017) (holding that a district court may deny "a new trial motion if there was some reasonable basis for the jury's verdict").

For these reasons, the Court rejects Defendants' arguments for a new trial based on sufficiency of the evidence.

*2. Inflammatory Comments*

Defendants also argue that Plaintiffs' counsel's, Mr. Esfandiary ("Counsel"), made inflammatory and prejudicial comments during closing arguments, necessitating a new trial. A new trial is warranted when the attorney misconduct "sufficiently permeates an entire proceeding to provide conviction that the jury was influenced by passion and prejudice in reaching its verdict." *Settlegoode v. Portland Pub. Schs.*, 371 F.3d 503, 516–17 (9th Cir. 2004) (citation modified). "There is an even higher

threshold for granting a new trial where, as here, defendants failed to object to the alleged misconduct during trial." *Id.* at 517 (citation modified).

None of Counsel's comments that Defendants identify reach the "higher threshold for granting a new trial." *Id.* Defendants object to Counsel's damages argument to the jury, seemingly objecting to Counsel's invocation of certain dollar figures. (Mot. JMOL 22.) Of course, damages anchoring is not a new or novel practice, nor has the Ninth Circuit expressly prohibited it. And whatever one may think of the practice, it certainly did not "permeate[] an entire proceeding." *Settlegoode*, 371 F.3d at 516. That is especially true here, considering Counsel rushed through that section of his argument after the Court non-verbally indicated that his time was running short. Defendants' argument is also devoid of further context: Counsel explicitly told the jury that while he "think[s] the evidence supports these numbers," he told them they "can choose more" or "choose less." (Trial Tr. 866:8–9.)

Defendants also object to two misstatements of the law in Counsel's closing arguments. (Mot. JMOL 22–23.) First, Defendants point to Counsel's statement that if the jury could not "decide which officer's bullet hit him . . . you have to find them both liable." (*Id.* (citing Trial Tr. 862:15–19).) However, Counsel's statement is an accurate description of alternative liability. *See* Jud. Cons. of Cal. Civil Jury Instr. ("CACI") No. 434 (2026) ("If you cannot decide which defendant caused plaintiff's harm, you must decide that each defendant is responsible for the harm."). Second, Defendants point to Counsel's comment about negligence, in which he stated that "[n]egligence simply means [Officer Defendants] should have been more careful and [they] weren't and someone got hurt." (Mot. JMOL 23 (citing Trial Tr. 862:3–4).) While perhaps inartful and not entirely accurate, the Court cannot say that statement could have left the jury influenced by passion and prejudice, especially where Defendants failed to object to it during trial.

For these reasons, the Court rejects Defendants' arguments for a new trial based on Counsel's closing comments.

*3. Excessive Damages*

Finally, Defendants argue that jury's award of $3,676,431 for loss of earning capacity and $8,000,000 for past and future non-economic damages is excessive and requires a new trial or remittitur. (*Id.* at 19–21, 23–27.)

Courts must afford "substantial deference" to a jury's findings as to the appropriate amount of damages. *Del Monte Dunes at Monterey, Ltd. v. City of Monterey*, 95 F.3d 1422, 1435 (9th Cir. 1996). However, damages awards that are "clearly not supported by the evidence" or "only based on speculation or guesswork" cannot stand. *In re First Alliance Mortg. Co.*, 471 F.3d 977, 1001 (9th Cir. 2006). In reviewing an award for excessiveness, a court views the evidence in a light most favorable to the prevailing party, disturbing only those awards that it concludes are "grossly excessive or monstrous" or are "based on passion or prejudice." *Lambert v. Ackerly*, 180 F.3d 997, 1011 (9th Cir. 1999) (en banc) (citation modified).

"[E]vidence presented at trial should be given foremost priority in assessing the reasonableness of a damages award." *Bell v. Williams*, 108 F.4th 809, 832 (9th Cir. 2024). For example, "[e]vidence supporting an emotional damages award may consist of nothing more than oral testimony," but may also include "loss of income and documentation of medical treatment or conditions caused by the distress . . . and physical injuries caused by the distress." *Id.* When evidence is insufficient to support an award, courts may "consider awards in comparable cases." *Id.* However, courts must "exercise caution when comparing damages awards between cases," for even "if two cases appear factually similar, the strength of evidence presented at trial may vary in ways impossible to fully appreciate." *Id.* "Nevertheless, awards in previous cases that are similar enough to serve as a meaningful benchmark may provide insight in determining whether an award was within reasonable bounds." *Id.* (citation modified).

(a) Loss of Earning Capacity

The Court starts with the jury's award of $3,676,431 for loss of earning capacity. Defendant argues that this figure is excessive because Castellanos "can still enter his desired industry of choice, cybersecurity." (Mot. JMOL 24.) This argument misses the mark. Whether Castellanos can enter his desired industry of choice is does not matter What matters is whether Castellanos stands to earn less than he would have without the injury. (Jury Instr. No. 28., Dkt. No. 210.) As an analogy, one can work in the "sports" field as a baseball player, making millions of dollars, or a clubhouse attendant, making far less. Here, the evidence demonstrates, and Defendants admit, that "any prospective employer would have to accommodate any limitation Plaintiff's injury caused." (Mot. JMOL 25.) Considering this undisputed fact, the jury could reasonably give credit to Castellanos's experts who corroborated this fact and supplied empirical evidence to demonstrate how much Castellanos stands to lose throughout his career. And while Defendants argue that the Court should not credit Castellanos's experts' testimony regarding wage loss, (*id.* at 25 n.4), Defendants' arguments ring hollow considering they failed to offer any rebuttal testimony to Castellanos's experts. For these reasons, the Court finds that the jury's loss of earning capacity award is supported by the evidence and is not "grossly excessive or monstrous." *Lambert*, 180 F.3d at 1011.

(b) Past and Future Non-Economic Damages

The same cannot be said for the jury's award of $8,000,000 for past and future non-economic damages. The jury awarded Castellanos $1,000,000 for past non-economic damages and $7,000,000 for future non-economic damages.[6] (Verdict 6.) Considering the parties all but agreed that, for purposes of damages calculations, Castellanos is expected to live another fifty-two years, (Trial Tr. 667:10–

[6] Non-economic damages include damages for "pain and suffering, emotional distress, disability, disfigurement, and loss of enjoyment of life experienced." (Verdict 6.)

11, 818:9–17), this means the jury awarded Castellanos around $135,000 per year in future non-economic damages.

The Court is left with the inescapable conclusion that the jury was motivated by animus toward Defendants and was silently imposing punitive damages. First, when considering the evidence at trial, an award of $135,000 for every year of Castellanos's life is shocking. While the Court does not doubt that Castellanos suffered pain after his injury, Castellanos's testimony that the pain was "extreme" lacks credibility. Castellanos did not immediately seek medical attention or go to his hospital. Instead, he went to a friend's house and waited for his father, who was thirty minutes away in Corona, to pick him up. (Trial Tr. 157:2–16, 174:6–21.) The Court was also left with the distinct impression that Castellanos oversold the impact his blindness in one eye has on him. For example, Castellanos testified about "bumping into stuff" at his new job and putting products in the wrong box, and that he will not be able to play catch with his future children. (Trial Tr. 159:13–19, 162:11–23.) While the Court does not discount the impact that permanent blindness in one eye can have on someone, the testimony was melodramatic and overwrought. Suddenly losing vision in one eye does not mean that one is suddenly without capacity to use a computer or play catch. *See, e.g.*, *Drew Robinson*, Minor League Baseball (last visited Sept. 28, 2026), https://www.milb.com/player/drew-robinson-592685 (recording forty putouts and no errors while hitting three home runs only one year removed from losing vision in one eye).

Additionally, Counsel permeated his closing arguments with personal attacks on Defendants' counsel, as if asking the jury to punish Defendants for their counsel's trial tactics. He accused Defendants' counsel of lying about a reasonable factual dispute that had no direct evidence, specifically, what exactly impacted Castellanos's right eye. (Trial Tr. 858:4–5.) He asked the jury to "think about how low they're willing to stoop to defend against this case . . . in rendering a verdict," a factor that has no place in the jury's deliberation. (Trial Tr. 859:11–12; *see also* Trial Tr. 861:12–13

("Consider the tactics that they're using.").) Counsel also accused Defendants' counsel of "browbeat[ing] and bull[ying] [Castellanos]," when all Defendants' counsel did was vigorously defend his client, as his client and the Court expected him to do. (Trial Tr. 861:6–7.) This behavior is well below the standards of civility and professionalism it expects from counsel practicing in this bar, and certainly "provide[s] conviction that the jury was influenced by passion and prejudice in reaching its verdict." *Settlegoode*, 371 F.3d at 516–17. The jury's excessive non-economic damages award reflects this passion and prejudice.

Finally, the jury's verdict is without equivalence in case law, even when accounting for the effects of inflation. In coming to this conclusion, the Court undertook a survey of cases where plaintiffs lost full or partial vision in an eye due to defendant's actions, regardless of fora:

- In *Stineman v. Fontbonne College*, the Eighth Circuit reversed a jury award of $800,000 (present-day $3,080,276),[7] and ordered a remittitur to $600,000 ($2,310,207), where the plaintiff lost vision in one eye due to an errant softball. 664 F.2d 1082, 1085, 1088–89 (8th Cir. 1981) ("Jury awards in Missouri for loss of vision in one eye have not approached the $800,000 [($3,080,276)] awarded here.").
- In *Ringis v. Otting*, a California Court of Appeal upheld a jury verdict of $20,000 ($385,035) when plaintiff lost vision on one eye after defendant shot him in a hunting accident. 63 Cal. App. 2d 88, 89–90, 92 (1944) ("There are several reported cases in which similar amounts have been held to be proper awards for the loss of an eye.").
- In *Cervantes v. County of Los Angeles*, a court in this District remitted a jury verdict of $900,000 ($1,290,000) to $500,000 ($716,666) where an aspiring

---

[7] Throughout this section, the figures in parentheses represent the damages award when adjusted for inflation, rounded up, and indexed to 2026 using the Bureau of Labor Statistics' Consumer Price Index calculator. *See CPI Calculator*, Bureau of Labor Statistics, (last visited Sept. 28, 2026) https://www.bls.gov/data/inflation_calculator.htm.

professional billiards player suffered continued "floaters in his vision," "eye pain," and "internal ocular bleeding" after the defendant struck him in the face. No. 2:12-cv-09889-DDP (MRWx), 2015 WL 5163031, at *1–3 (C.D. Cal. Sept. 3, 2015).

While not factually identical, the cases above are sufficiently analogous and lead the Court to determine that the jury's award here is excessive.

The cases Castellanos cites miss the mark completely. (Opp'n Mot. JMOL 23 n.4.) First, Castellanos cites *Bowman v. Wyatt*, where the jury awarded $15,735,404 ($22,239,104) to a partially blind plaintiff. 186 Cal. App. 4th 286 (2010). As an initial matter, the court in *Bowman* does not discuss damages, and it is unclear whether the appellant even raised excessiveness of damages. *See generally id.* Further, Castellanos leaves out that the plaintiff in *Bowman* suffered from "traumatic brain injury, a stroke, [hearing loss], a jaw laceration, a frozen shoulder, compound leg fractures, and a hip fracture." *Id.* at 294–95. Without diminishing Castellanos's vision loss, *Bowman* works against Castellanos, considering the relative severity of the plaintiff's injuries in *Bowman* compared to Castellanos's injuries. Second, Castellanos cites two police use-of-force cases: *B.B. v. County of Los Angeles*, 10 Cal. 5th 1, 4 (2020), where the jury awarded $8,000,000 ($10,388,145) in non-economic damages, and *Valenzuela v. City of Anaheim*, 6 F.4th 1098, 1101 (9th Cir. 2021), where jury awarded $13,200,000 ($16,070,931) in damages. As with *Bowman*, Castellanos leaves out the significant distinction, that both *B.B.* and *Valenzuela* were wrongful death cases, rendering them factually and legally inapposite.

In sum, after reviewing the evidence and factually analogous cases, the Court finds that the jury here made a mistake and awarded grossly excessive non-economic damages. The Court will remit non-economic damages by half: $500,000 in past non-economic damages and $3,500,000 in future non-economic damages. Should Castellanos choose not to accept the reduced award, the Court will order a new trial on past and present non-economic damages.

### C. Conclusion—Rule 59(a)

Having reviewed the entire record, weighed the evidence, and assessed witness credibility pursuant to Rule 59(a), the Court **CONDITIONALLY DENIES** Defendants' motion for a new trial but **GRANTS** Defendants' motion for a remittitur. Specifically, Castellanos must choose between accepting $4,000,000 in past and present non-economic damages or a new trial on non-economic damages. *See Cosby v. AutoZone, Inc.*, 445 F. App'x 914, 917 (9th Cir. 2011) ("In the event [plaintiff] refuses remittitur, a new trial will go only to the issue of damages.").

## V. MOTION TO AMEND JUDGMENT

Castellanos moves to amend the Court's judgment. (Mot. Am. 1–2.)

### A. Legal Standard—Rule 59(e)

"Although Rule 59(e) permits a district court to reconsider and amend a previous [judgment], the rule offers an extraordinary remedy, to be used sparingly in the interests of finality and conservation of judicial resources." *Kona Enters., Inc. v. Est. of Bishop*, 229 F.3d 877, 890 (9th Cir. 2000) (citation modified). "[A] motion for reconsideration [under Rule 59(e)] should not be granted, absent highly unusual circumstances, unless the district court is presented with newly discovered evidence," clear error, an intervening change in controlling law, or manifest injustice. *Carroll v. Nakatani*, 342 F.3d 934, 945 (9th Cir. 2003); *Turner v. Burlington N. Santa Fe R. Co.*, 338 F.3d 1058, 1063 (9th Cir. 2003).

A motion to alter or amend a judgment "may not be used to relitigate old matters, or to raise arguments or present evidence that could have been raised prior to the entry of judgment." *Exxon Shipping Co. v. Baker*, 554 U.S. 471, 485 n.5 (2008); *Kona*, 229 F.3d at 890. Therefore, a court may disregard "repeated legal arguments" and "facts that were available earlier in the proceedings." *Zimmerman v. City of Oakland*, 255 F.3d 734, 740 (9th Cir. 2001). A district court has considerable discretion when considering a motion to amend a judgment under Rule 59(e).

*McDowell v. Calderon*, 197 F.3d 1253, 1255 n.1 (9th Cir. 1999); *Arteaga v. Asset Acceptance*, 733 F. Supp. 2d 1218, 1236 (E.D. Cal. 2010).

**B. Discussion—Rule 59(e)**

Castellanos moves to amend the Court's judgment, asking for treble damages and prejudgment interest. (Mot. Am.. 1–2.)

*1. Treble Damages*

Castellanos asks the Court to award treble damages under the Bane Act. (*Id.* at 13–15.) Under California Civil Code section 52(a), violation of the Bane Act may result in treble damages equal "to a maximum of three times the amount of actual damage." Courts in this District have found that only factfinders—specifically, "a jury, or a court sitting without a jury"—can award treble damages, meaning that courts may not add treble damages as a post-verdict award. *Smith v. City of La Verne*, No. 2:23-cv-00644-KK (Ex), 2024 WL 4331733, at *6 (C.D. Cal. Sept. 4, 2024), *aff'd*, No. 24-5805, 2025 WL 2992541 (9th Cir. Oct. 24, 2025). Thus, the Court questions whether it has the authority to award treble damages here considering the parties did not put the question to the jury.

However, the Court need not decide that question because treble damages are not warranted here for all the reasons the Court found the jury's damages award excessive. Awarding treble damages would serve only to compound the jury's error and would likely result in one of the largest police use-of-force damages awards in this country's history for loss of vision in one eye. Thus, the Court declines to exercise its discretion to award treble damages.[8]

[8] In his opening brief, Castellanos asks the Court to exercise its discretion to award treble damages. (Mot. Amend 11 (referring to the Bane Act's treble damages provision as "discretionary"), 13 ("The Court should *exercise its discretion* to award the maximum treble amount.").) Only in his reply brief does he suggest treble damages are automatic. (Reply Mot. Amend 13, Dkt. No. 244.) Castellanos provides no authority to support his position, and in any event, the Court declines to consider his argument that treble damages are automatic because Castellanos did not raise it in his opening brief.

2. *Prejudgment Interest*

Castellanos seeks prejudgment interest on the jury's award of past non-economic damages. (Mot. Am. 19.) While post-judgment interest is mandatory, "the ultimate decision whether to award prejudgment interest lies within the court's sound discretion, to be answered by balancing the equities." *Barnard v. Theobald*, 721 F.3d 1069, 1078 (9th Cir. 2013). Prejudgment interest serves to compensate, rather than punish. *Schneider v. County of San Diego*, 285 F.3d 784, 789 (9th Cir. 2002).

Considering the compensatory purpose of prejudgment interest, the Court finds that prejudgment interest is appropriate here to make Castellanos whole. Indeed, Defendants do not argue the equities. Rather, citing exclusively California cases, they argue that prejudgment interest is categorically unavailable for non-economic damages and in personal injury cases. (Opp'n Mot. Am. 17–23, Dkt. No. 239.) However, the Ninth Circuit has expressly held that courts may award prejudgment interest on both economic and non-economic damages in § 1983 cases, such as this one. *Barnard*, 721 F.3d at 1078. Defendants' citations to California cases regarding availability of prejudgment interest under California law must give way to the Ninth Circuit's explicit command in *Barnard* regarding federal law.

For these reasons, the Court will award prejudgment interest on the final past non-economic damages award.

**C. Conclusion—Rule 59(e)**

For the reasons discussed, the Court **GRANTS IN PART** Castellanos's motion to amend. Specifically, the Court will award prejudgment interest on past non-economic damages, whether it is the remitted figure or a figure established at a new trial. The Court **DENIES** the balance of the motion to amend.

## VI. MOTION FOR ATTORNEY'S FEES AND COSTS

Castellanos requests reasonable attorneys' fees and costs incurred in prosecuting this matter. (Mot. Fees 1.) The parties do not dispute that Castellanos is

entitled to reasonable attorneys' fees as prevailing party in this action. (*See generally id.*; Opp'n Mot. Fees, Dkt. No. 236.)

**A. Legal Standard—Attorneys' Fees**

Section 1988 authorizes a district court "to award a reasonable attorney's fee to prevailing parties in civil rights litigation." *Hensley v. Eckerhart*, 461 U.S. 424, 429 (1983) (citing 42 U.S.C. § 1988). The purpose of § 1988 is to encourage "private enforcement of civil rights legislation that relies on the availability of fee awards." *Moreno v. City of Sacramento*, 534 F.3d 1106, 1111 (9th Cir. 2008). Therefore, "a prevailing plaintiff should ordinarily recover an attorney's fee unless special circumstances would render such an award unjust." *Hensley*, 461 U.S. at 429 (citation modified).

To determine a reasonable attorney fee under § 1988, federal courts employ the "lodestar method." *Kelly v. Wengler*, 822 F.3d 1085, 1099 (9th Cir. 2016). Under the lodestar method, a court multiplies "the number of hours an attorney reasonably expended on the prevailing party's case" with the attorney's "reasonable hourly rate, based on evidence of the market rate for the services provided." *Edmo v. Corizon, Inc.*, 97 F.4th 1165, 1168 (9th Cir. 2024). Once the lodestar figure is determined, the court then decides whether to adjust the figure based on a variety of factors.[9] "There is a strong presumption that the lodestar figure is a reasonable fee." *United Steelworkers of Am. v. Phelps Dodge Corp.*, 896 F.2d 403, 407 (9th Cir. 1990) (citation modified); *see also Edmo*, 97 F.4th at 1168 (holding that lodestar figures

---

[9] These factors are:

> (1) the time and labor required, (2) the novelty and difficulty of the questions involved, (3) the skill requisite to perform the legal service properly, (4) the preclusion of other employment by the attorney due to acceptance of the case, (5) the customary fee, (6) whether the fee is fixed or contingent, (7) time limitations imposed by the client or the circumstances, (8) the amount involved and the results obtained, (9) the experience, reputation, and ability of the attorneys, (10) the 'undesirability' of the case, (11) the nature and length of the professional relationship with the client, and (12) awards in similar cases.

*Id.*

should be adjusted only in "rare" and "exceptional" cases). The fee applicant bears the "burden of showing that the claimed rate and number of hours are reasonable." *Blum v. Stenson*, 465 U.S. 886, 897 (1984).

**B. Discussion—Attorneys' Fees**

Castellanos seeks the following fees:

| Attorney | Lodestar Hours | Lodestar Rate | Lodestar Total |
|---|---|---|---|
| Timothy A. Loranger | 173.2 | $1,200 | $207,840.00 |
| Monique A. Alarcon | 499.3 | $850 | $424,405.00 |
| Pedram Esfandiary | 431.45 | $850 | $366,732.50 |
| Matthew P. French | 70.9 | $650 | $46,085.00 |
| **TOTAL** | | | **$1,045,062.50** |

(Mot. Fees 20; Decl. Monique A. Alarcon ISO Mot. Fees ("Alarcon Decl.") ¶ 5, Dkt. No. 222-1; Decl. Pedram Esfandiary ISO Mot. Fees ("Esfandiary Decl.") ¶ 4, Dkt. No. 222-6; Decl. Timothy A. Loranger ISO Mot. Fees ("Loranger Decl.") ¶¶ 4, 10, 12, Dkt. No. 222-8.) Castellanos also seeks a 2.0 lodestar multiplier. (Mot. Fees 15–18.) Castellanos also self-imposes a 3% haircut to account for a reasonable reduction of time spent litigating *Monell* claims that the Court dismissed prior to trial. (Mot. Fees 18–20.) The Court applies that haircut after making necessary reductions as discussed below.

*1. Hourly Rates*

To determine whether hourly rates are reasonable under § 1988, fees "are to be calculated according to the prevailing market rates in the relevant community, taking into consideration the experience, skill, and reputation of the attorney." *Dang v. Cross*, 422 F.3d 800, 813 (9th Cir. 2005) (citation modified). "[T]he relevant community is the forum in which the district court sits." *Camacho v. Bridgeport Fin., Inc.*, 523 F.3d 973, 979 (9th Cir. 2008). "Affidavits of the plaintiffs' attorney and other attorneys regarding prevailing fees in the community, and rate determinations in other cases, particularly those setting a rate for the plaintiffs' attorney, are satisfactory evidence of the prevailing market rate." *United Steelworkers*, 896 F.2d at 407.

Castellanos submits declarations from Mr. Loranger, Ms. Alarcon, and Mr. Esfandiary in support of their requested rates and detailing their experience.[10] (*See generally* Loranger Decl.; Alarcon Decl.; Esfandiary Decl.) Castellanos also submits the expert declaration of Carol Sobel, a former ACLU attorney and current private practitioner who has often filed declarations in other cases opining on attorneys' fees. (*See* Decl. Carol A. Sobel ISO Mot. Fees ("Sobel Decl.") ¶¶ 11–12, Dkt. No. 222-11.) While the Court has no reason to doubt Sobel's qualifications, the persuasiveness of her declaration suffers from the fact that there is little more than conclusory discussion of the skill and reputation of Castellanos's attorneys. Nor does Sobel, or any other attorney, compare awards to Loranger, Alarcon, Esfandiary, or French in other cases. It is further unclear to the Court why Sobel cites fees from inapposite cases, (*see, e.g.*, *id.* ¶ 38 (discussing settlement fees from an anti-SLAPP case), or why she so heavily relies on fees awarded in *Los Angeles Alliance for Human Rights v. City of Los Angeles*, No. 2:20-cv-02291-DOC (KESx), a sprawling homeless rights case in this District that has no material factual or legal comparison to this one, (*see, e.g.*, Sobel Decl. ¶¶ 34–37, 40–41).

To the extent it is persuasive, evidence is evidence though, and once the party claiming fees presents evidence supporting the claimed rate, the burden shifts to the party opposing fees to present equally specific countervailing evidence. *Gates v. Deukmejian*, 987 F.2d 1392, 1397–98, 1405 (9th Cir. 1992). Here, Defendants point to two cases: (1) *Antuna v. County of Los Angeles*, No. 2:14-cv-05600-MWF (PLAx), 2016 WL 11743321, at *4 (C.D. Cal. Mar. 8, 2016), where a court in this District listed rates it found reasonable to "attract competent civil rights counsel to do similar work"; and (2) *Zelaya v. City of Los Angeles*, No. 2:20-cv-08382-ODW (MAAx), 2024 WL 3183882, at *2–4 (C.D. Cal. June 24, 2024), where this Court awarded fees in a wrongful death § 1983 case. (Opp'n Mot. Fees 5–6.) However, *Antuna* does not

[10] As French is no longer employed at Wisner Baum, Loranger discusses French's rates in his declaration. (Loranger Decl. ¶ 10.)

bind this Court. And Defendants' citation to this Court's decision in *Zelaya* is as defective as Sobel's comparisons, offering little but conclusory analysis as to why Loranger, Alarcon, Esfandiary, and French have any more or less skill or reputation than the attorneys in *Zelaya*.

The Court is left with no choice but to rely on its "own knowledge of customary rates" and its "familiarity with the legal market." *Ingram v. Oroudjian*, 647 F.3d 925, 928 (9th Cir. 2011). The Court will adjust Loranger's rate to $1,000, because while the Court is mindful of Loranger's experience, the Court lacks much evidence, other than some awards, as to Loranger's skill and reputation. The Court will also adjust French's rate to $450, as the Court is completely without any evidence of his skill and reputation. However, the Court will not adjust Alarcon's and Esfandiary's rates, as their rates are well within reason for civil rights attorneys with commensurate experience who invested substantial time and effort into this case.

*2. Hourly Rates*

"A district court has wide latitude in determining the number of hours that were reasonably expended by the prevailing lawyers." *Sorenson v. Mink*, 239 F.3d 1140, 1146 (9th Cir. 2001). "The essential goal in shifting fees (to either party) is to do rough justice, not to achieve auditing perfection." *Fox v. Vice*, 563 U.S. 826, 838 (2011) ("[T]rial courts . . . should not . . . become green-eyeshade accountants."). Thus, the court "may take into account [its] overall sense of a suit." *Id.* The court "should defer to the winning lawyer's professional judgment as to how much time he was required to spend on the case." *Moreno*, 534 F.3d at 1112 (noting that civil rights lawyers on contingency fee cases are "not likely to spend unnecessary time on contingency fee cases in the hope of inflating their fees [because] the payoff is too uncertain"). "[T]he extent of a plaintiff's success is a crucial factor in determining the proper amount of an award of attorney's fees under 42 U.S.C. § 1988." *Hensley*, 461 U.S. at 439.

"The fee applicant bears the burden of documenting the appropriate hours expended in the litigation and must submit evidence in support of those hours worked." *Gates*, 987 F.2d at 1397. Once the applicant meets her burden, the party opposing the fee award must "come up with specific reasons for reducing the fee request that the district court finds persuasive." *Moreno*, 534 F.3d at 1116. If the opposing party cannot, the court "should normally grant the award in full, or with no more than a haircut." *Id.*

Here, Castellanos's counsel each submit timekeeping records. (*See, e.g.*, Alarcon Decl. Ex. B, Dkt. No. 222-3.) Thus, the burden shifts to Defendants to offer specific persuasive reasons for reducing the fee award. Defendants identify six grounds for reduction. (Opp'n Mot. Fees 8–16.)

(a) <u>Block Billing</u>

First, Defendants argue that Castellanos's counsel impermissibly block-billed, preventing meaningful review. (*Id.* at 11.) Block billing is "the time-keeping method by which each lawyer and legal assistant enters the total daily time spent working on a case, rather than itemizing the time expended on specific tasks." *Welch v. Metro. Life Ins. Co.*, 480 F.3d 942, 945 n.2 (9th Cir. 2007). This billing practice "makes it difficult for the court to determine how much time was actually spent on particular work." *SAS v. Sawabeh Info. Servs. Co.*, No. 2:11-cv-04147-MMM (MANx), 2015 WL 12763541, at *33 (C.D. Cal. June 22, 2015). Thus, the Ninth Circuit has recognized district courts' authority to reduce hours that are block billed if the party seeking fees fails to provide enough information to reveal whether the amount of time spent performing tasks was reasonable. *Welch*, 480 F.3d at 948.

Here, however, the Court's review of the timesheets reveals minimal block-billing. Even where Castellanos's counsel engaged in block billing, the tasks billed are so similar that it would seem meaningless to separate. For example, Defendants point to Alarcon's September 7, 2023 entry for 5.4 hours dedicated to "[d]raft[ing] opposition to qualified-immunity defense" and "research[ing] case law."

(Opp'n Mot. Fees 9.) It is more than reasonable for one to continue researching as one is drafting; in fact, the Court expects attorneys practicing before it to continue verifying their work as they draft. Thus, the Court declines to reduce Castellanos's requested hours for block billing.

(b) Vague Entries

Second, Defendants argue that several of Castellanos's counsel's time entries are too vague. (*Id.* at 11–12.) Specifically, Defendants point to Loranger's and French's September 16 and 17 entries for "[r]eview[ing]," "edit[ing]," and draft[ing]" Castellanos's opposition to Defendants' motion for summary judgment. (*Id.* at 12.) Vague time entries render the Court "unable to discern how the time spent is attributable to the case at hand." *Santiago v. Equable Ascent Fin.*, No. C 11-3158 CRB, 2013 WL 3498079, at *5 (N.D. Cal. July 12, 2013). However, the Court disagrees that these entries are vague. The time spent on the eve of a filing deadline will often be completely dedicated to the filing, and the Court can easily discern that Loranger and French spent September 16 and 17 finalizing their opposition brief. The Court declines to reduce Castellanos's requested hours for vagueness.

(c) Attorney Stacking

Third, Defendants object to two or three of Castellanos's counsel billing for the same deposition. (Opp'n Mot. Fees 12–13.) Specifically, Defendants point to four depositions: Chief Michel Moore's, Officer Ji Kim's, Officer Jesse Pineda's, and Castellanos's. (*Id.*) Courts may reduce the number of hours awarded when a lawyer performs "unnecessarily duplicative work." *Moreno*, 534 F.3d at 1112.

Two attorneys attending a deposition is not duplicative. *See Frias v. City of Los Angeles*, No. 2:15-cv-04626-PSG (SKx), 2020 WL 4001620, at *4 (C.D. Cal. Apr. 23, 2020) ("[I]t is not uncommon for multiple attorneys to attend depositions."). This is especially true here, where Loranger supervised French, a relatively junior attorney, during French's depositions of Officers Kim and Pineda. In declining to reduce French's or Loranger's requested hours for deposing Officers Kim and Pineda, the

Court promotes furnishing junior attorneys with opportunities to conduct depositions under supervision. It is for that same reason that the Court finds Alarcon's and Loranger's requested hours for deposing Chief Moore are duplicative: both are partners, and both did not need to be at Chief Moore's deposition. The Court will reduce **three** of Loranger's requested hours for attending Chief Moore's deposition. The Court will also reduce **one** hour from Esfandiary's requested hours for misreporting this attendance at Chief Moore's deposition. (*See* Reply Mot. Fees 10 n.1, Dkt. No. 238.)

In some cases, the complexity of a case may warrant three or more attorneys at a deposition. This is not one of those cases. There is no reason why three attorneys needed to attend their client's deposition, here, Castellanos's, when their role was likely mostly limited to defending against Defendants' counsel's questioning. The Court will further reduce **two** of Esfandiary's requested hours and **one** of Loranger's requested hours for attending Castellanos's deposition.

In sum, the Court reduces **four** hours from Loranger's requested hours and **three** from Esfandiary's requested hours for stacking attorneys at depositions.

(d) Duplicative Conferences

Fourth, Defendants object to several duplicative internal conferences, specifically, entries on October 2, 2024, and October 11, 2024. (Opp'n Mot. Fees 13–14.) Defendants do not demonstrate why Castellanos's counsel is not entitled to billing conservative amounts—here, one hour—to internal trial team meetings. The Court declines to reduce Castellanos's requested hours for duplicative conferences.

(e) Focus Group and Trial Preparation

Fifth, Defendants object to "excessive focus-group and trial-preparation time." (*Id.* at 14.) Specifically, Defendants object to Alarcon billing twenty hours over two days preparing for and presenting to a focus group. This case was not complex enough to warrant the use of a focus group, and Castellanos provides no persuasive argument to the contrary. (Reply Mot. Fees 12.) Thus, the Court exercises its

discretion and will reduce Alarcon's hours spent preparing for and presenting to a focus group, specifically, all **twenty** hours. *See United Steelworkers of Am. v. Phelps Dodge Corp.*, 944 F.2d 910, 1991 WL 178115, at *2 (9th Cir. 1991) ("It was well within the discretion of the district court to determine that [holding a mock trial was] unreasonable given the nature of this litigation.").

Defendants also object to Esfandiary's April 13, 2026 entry for "[p]repared for trial." (Opp'n Mot. Fees 14.) The Court is cognizant that the days leading up to trial are hectic, and such entries generally do not merit a second look. However, Esfandiary appeared to double-bill for April 13, considering he also bills another fifteen hours for various tasks related to the verdict form and jury instructions. (*See* Esfandiary Decl. Ex. A at 5–6, Dkt. No. 222-7.) Thus, unless Esfandiary found thirty hours in a day, his April 13 entry is unsupported. The Court will reduce **fifteen** hours from Esfandiary's requested hours.

Finally, Defendants object to Esfandiary's April 15, 2026 trial day entry. (Opp'n Mot. Fees 14.) The Court understands that trial days are long and will not require attorneys to break out exactly what they did on each day of trial. The Court declines to reduce Esfandiary's April 15 entry.

In sum, the Court reduces **twenty** hours from Alarcon's requested hours and **fifteen** hours from Esfandiary's requested hours.

(f) <u>Clerical Work</u>

Finally, Defendants object to any time spent for clerical work. Purely clerical or secretarial tasks are not compensable. *Nadarajah v. Holder*, 569 F.3d 906, 921 (9th Cir. 2009) ("When clerical tasks are billed at hourly rates, the court should reduce the hours requested to account for the billing errors."). Here, Defendants point to French's 0.1 entry for internal correspondence regarding filing a notice of appearance. The Court agrees that the entry entails a clerical task and reduces **0.1** from French's requested hours.

Defendants also point to Alarcon's time entries regarding service and filing. However, Alarcon notes in her time entries that she was not filing or serving, but rather overseeing filing and service. As the Court has noted in the past, overseeing and coordinating clerical tasks is not clerical work in and of itself.

For these reasons, the Court deducts **0.1** hours from French's requested hours and declines to reduce Alarcon's hours for clerical tasks.

*3. Revised Lodestar Figures*

In sum, after reducing the requested lodestar hours and lodestar rates, the Court arrives at the following figures:

| Attorney | Lodestar Hours | Lodestar Rate |
|---|---|---|
| Timothy A. Loranger | 169.2 | $1,000 |
| Monique A. Alarcon | 479.3 | $850 |
| Pedram Esfandiary | 413.45 | $850 |
| Matthew P. French | 70.8 | $450 |

Further, after applying Castellanos's self-imposed 3% haircut on his requested hours, (Mot. Fees 18–20), the Court arrives at the following figure:

| Attorney | Lodestar Hours | Lodestar Rate | Lodestar Total |
|---|---|---|---|
| Timothy A. Loranger | 164.124 | $1,000 | $164,124.00 |
| Monique A. Alarcon | 464.921 | $850 | $395,182.85 |
| Pedram Esfandiary | 401.047 | $850 | $340,889.95 |
| Matthew P. French | 68.676 | $450 | $30,904.20 |
| **TOTAL** | | | **$931,101.00** |

*4. Lodestar Multiplier*

Castellanos seeks a 2.0 lodestar multiplier. To determine whether a multiplier is warranted, the Court must determine various factors, including "(1) the novelty and difficulty of the questions involved, (2) the skill displayed in presenting them, (3) the extent to which the nature of the litigation precluded other employment by the attorneys, and (4) the contingent nature of the fee award." *Ketchum v. Moses*, 24 Cal.

4th 1122, 1132 (2001). While Castellanos's counsel achieved an excellent result for their client, this case did not involve very novel or difficult questions, nor was there any showing that this litigation precluded other employment. The Court declines to award a lodestar multiplier.

**C. Discussion—Costs**

Castellanos seeks $113,278.17 in nontaxable costs under § 1988. (Mot. Fees 20–22.) "It is well established that attorney's fees under 42 U.S.C. § 1988 include reasonable out-of-pocket litigation expenses that would normally be charged to a fee paying client, even if the court cannot tax these expense as 'costs' under 28 U.S.C. § 1920." *Trs. of Const. Indus. & Laborers Health & Welfare Tr. v. Redland Ins. Co.*, 460 F.3d 1253, 1257 (9th Cir. 2006). Here, Castellanos seeks the following in nontaxable costs:

| Category | Cost |
|---|---|
| Trial hotel and war room | $45,481.50 |
| Jury consultant and focus group | $26,004.56 |
| Defense expert deposition fees | $2,850.00 |
| Video depositions | $8,391.59 |
| Investigations | $946.79 |
| Pre-trial uber, parking, meals | $1,076.11 |
| Trial-related charges: Uber, parking, meals, dry cleaning, laundry, trial war room supplies | $7,660.68 |
| Trial airfare, flight insurance | $1,870.39 |
| Daily trial transcripts | $9,356.34 |
| Copier rental and printer purchase | $8,486.11 |
| Trial blow-ups, photos, charts | $1,154.10 |
| **Total** | $113,278.17 |

First, the trial hotel and war room. Those costs are not reasonable. Castellanos's counsel belong to the firm Wisner Baum, which is based in Los Angeles and whose office is a stone's throw away from the courthouse. While Castellanos's counsel is more than entitled to pay to relocate for trial, the Court will not reallocate

those expenses when we ask court personnel and jury members to travel similar, if not further, distances every day.

Second, the jury consultant and focus group. The jury consultant is reasonable and recoverable. *See Colony Cove Props., LLC v. City of Carson*, No. 2:14-cv-03242-PSG (PJWx), 2016 WL 11756096, at *9 (C.D. Cal. Aug. 15, 2016) (awarding jury consultant costs). However, as the Court previously noted, the focus group was unnecessary and is therefore unreasonable. The Court deducts **$8,295.80**, the cost of the focus group, from recoverable costs. (Alarcon Decl. Ex. C ("Receipts") Tab 2, Dkt. No. 222-4.)

Third, deposition fees incurred in deposing defense experts Ed Flosi and Dr. Jeff Wertheimer. Considering these costs were incurred in deposing Defendants' experts, these costs are reasonable and recoverable.[11]

Fourth, video depositions. As a default, video depositions are not taxable unless ordered by the court. C.D. Cal. L.R. 54-3.5. The Court is aware that video depositions are most practical for witnesses that live outside the Court's subpoena power. However, Castellanos makes no effort to discuss which witnesses might fall into that category. Instead, it appears that every defense witness was subject to a video deposition, and with no apparent reason considering the Court did not see one second of the video testimony during pre-trial or trial. The video depositions costs are therefore unreasonable and unrecoverable.

Fifth, investigations. Courts have awarded investigation costs under other fee-shifting statutes. *See Levi Strauss & Co. v. Shilon*, 121 F.3d 1309, 1314 (9th Cir. 1997) (affirming award of investigative costs under Lanham Act). Considering that,

[11] The Court notes that it is awarding deposition fees incurred in deposing an expert, and not expert fees, as expert fees are not recoverable under § 1988 for § 1983 cases. *See Nguyen v. Regents of Univ. of Cal.*, No. 8:17-cv-00423-JVS (KESx), 2019 WL 3016768, at *3 (C.D. Cal. Mar. 25, 2019) ("The plain language of [42 U.S.C. § 1988] indicates that Congress intended to limit awards of expert fees to claims brought under §§ 1981 or 1981a, and that it does not apply to claims brought under § 1983").

without an investigation, cases often cannot get off the launch pad, Castellanos's investigation costs are reasonable and recoverable.

Sixth, Ubers and parking, both pretrial and during trial. Parking and transportation are reasonable costs. *See Marroquin v. Unidentified LAPD Officer*, No. 2:21-cv-07607-RGK (JEMx), 2023 WL 8143670, at *3 (C.D. Cal. Oct. 3, 2023) (awarding costs for parking and transportation). However, the Court cannot discern why some of Castellanos's Ubers were necessary to this litigation. For example, someone named Dalia Pastrana rode an Uber from what appears to be Wisner Baum's office to some location in or around mid-Wilshire. (Receipts Tab 6 at 56–57, Dkt. No. 222-4.)[12] As another example, on June 26, 2024—a date that has no significance on this case's docket—an individual named Miguel Gonzalez rode an Uber from in or around Signal Hill to Wisner Baum's office. (*Id.* at 59–61.) As Castellanos does not explain why Ubers that do not start or terminate at the courthouse were reasonable, the Court finds they are not recoverable. Additionally, as most of the Ubers taken during trial were Uber Blacks (Uber's premium service), the Court will reduce by half the costs of every Uber Black taken to and from the courthouse.[13] Finally, the Court cannot divine how FasTrak expenses in San Francisco possibly form any nexus to this case, and will deduct all those expenses. (*Id.* at 187.) Thus, the Court deducts **$542.49** from Castellanos's pretrial expenses, representing all the Ubers taken to and from places that are not the courthouse, and **$654.16** from Castellanos's trial expenses, representing half the Uber Black expenses incurred and the San Francisco FasTrak costs.

---

[12] The Court cites to the CM/ECF pagination here and for all other cites to the Receipts.

[13] Particularly egregious was Castellanos's counsel $50.97 receipt for an Uber Black to take them from the Omni Hotel in Los Angeles to the Courthouse, a distance of less than half a mile. (*Id.* at 255.)

Seventh, food. The Court will not shift food costs.[14] The Court deducts **$107.99** from Castellanos's pretrial expenses and **$3,825.79** from Castellanos's trial expenses.

Eighth, supplies. The Court can understand buying paper or ink for trial. The Court cannot understand buying a "34-Inch Ultrawide QHD Curved Monitor" and passing that cost off to Defendants. The Court deducts **$1,827.53** from Castellanos's trial expenses, representing four monitors and a standing desk.[15]

Ninth, trial airfare and travel insurance. Why Robert Wisner, an attorney who did not appear in this case, is submitting his expense for first class travel to and from Burbank and San Francisco, the Court cannot tell. (Receipts Tab 8 at 260–61, Dkt. No. 222-4.) Thus, the Court deducts **$549.80** from trial airfare and travel insurance.

Tenth, trial transcripts. As with video depositions, as a default, trial transcripts are not taxable unless approved by the Court or stipulated by counsel. The Court does not see why same-day delivery of trial transcripts was necessary in this case, and thus, declines to award costs incurred in ordering transcripts.

Eleventh, copier rental and printer insurance. Upon review of the receipts, it appears Castellanos is also asking the Court to shift costs for delivery of courtesy copies. (*See generally* Receipts Tab 10, Dkt. No. 222-4.) Those costs are reasonable. *See Rodriguez v. County of Los Angeles*, No. 2:10-cv-06342-CBM (AJWx), 2015 WL 13916519, at *3 (C.D. Cal. Nov. 12, 2025) (awarding costs for messenger service). Costs for renting a copy machine when Wisner Baum's office is fifteen miles away are not. (Receipts Tab 10 at 294–95.) The Court deducts **$4,704.91** for costs incurred in renting a copier and buying toner cartridges, a printer stand, and a printer.

Finally, trial blow-ups, photos, and charts. Castellanos describes these visual aids as "necessary to assist [the] jury." (Receipts Tab 11, Dkt. No. 222-4.) The Court

---

[14] Among these, particularly egregious was a $709.65 non-itemized receipt for a dinner at Bottega Louie on the last day of trial. (Receipts Tab 7 at 233, Dkt. No. 222-4.)

[15] It appears Castellanos double-billed for two monitors, so for simplicity's sake, the Court counts it as four monitors. (*Id.* at 78, 230.)

disagrees. While maybe helpful—and the jury is out on that question—they were certainly not necessary. The Court declines to shift these costs.

In sum, the Court will award the following nontaxable costs:

| Category | Cost |
|---|---|
| Trial hotel and war room | $0.00 |
| Jury consultant and focus group | $17,708.76 |
| Defense expert deposition fees | $2,850.00 |
| Video depositions | $0.00 |
| Investigations | $946.79 |
| Pre-trial uber, parking, meals | $425.63 |
| Trial-related charges: Uber, parking, meals, dry cleaning, laundry, trial war room supplies | $1,353.20 |
| Trial airfare, flight insurance | $1,320.59 |
| Daily trial transcripts | $0.00 |
| Copier rental and printer purchase | $3,781.20 |
| Trial blow-ups, photos, charts | $0.00 |
| **Total** | $28,386.17 |

**D. Conclusion—Attorneys' Fees and Costs**

In conclusion, the Court awards Castellanos **$931,101.00** in attorneys' fees and **$28,386.17** in costs.

\\
\\
\\
\\
\\
\\
\\
\\
\\
\\
\\
\\

## VII. CONCLUSION

For the reasons discussed above, the Court rules as follows:

- The Court **DENIES** Defendants' renewed motion for judgment as a matter of law, **CONDITIONALLY DENIES** Defendants' motion for a new trial, and **GRANTS** Defendants' motion for a remittitur, with further instructions below, (Dkt. No. 235);
- The Court **GRANTS IN PART** Plaintiffs' motion to amend the judgment and will award prejudgment interest on the final past non-economic damages award, (Dkt. No. 234); and
- The Court **GRANTS IN PART** Castellanos's motion for attorneys' fees and costs, awarding **$931,101.00** in attorneys' fees and **$28,386.17** in costs, to be paid within **forty-five (45) days** from the entry of this Order, (Dkt. No. 222).

With regards to the remittitur, the Court remits non-economic damages by half, resulting in past non-economic damages of $500,000 and future non-economic damages of $3,500,000. The Court leaves intact the jury's damages award of $135,749 for future medical care and $3,676,431 for loss of earning capacity. The Court **ORDERS** Castellanos to file a notice with the Court, no later than **fourteen (14) days** from the entry of this Order, indicating whether he wishes to accept the remittitur or go back to trial on the issue of non-economic damages.

**IT IS SO ORDERED.**

October 7, 2026

**OTIS D. WRIGHT, II**
**UNITED STATES DISTRICT JUDGE**